[Philadelphia, January, 10, 1831.]

## Appeal in the case of BILLINGTON'S ESTATE.

If the real and personal estate of a decedent are together sufficient to pay his debts, and leave a surplus to be distributed among his widow and children, the administrator is guilty of no misconduct in supplying out of the personal estate, the urgent wants of the widow and children, though that estate alone is not sufficient for the payment of the debts.

Where the estate of an intestate is considerably in debt, and debts to a large amount are due to it, which cannot be immediately collected, and the administrator does not appear to have retained money in his hands an unreasonable length of time, he is not personally chargeable with interest paid by him, on debts due by the estate.

Where the administrator of an embarrassed but solvent estate, in the course of collecting doubtful debts by suit, is obliged to bid at sheriff's sales under judgments obtained by him, for lands of debtors who have nothing else to levy upon, in order to prevent a great sacrifice of the property, and it appears from all the circumstances attending the transaction, that he purchased for the benefit of the family, and was considered by them as having done so, and they not only made no objection to what he had done, but when he offered either to keep the land and account for the price of it, or hold it as their trustee, they returned no answer to his proposal, they cannot afterwards treat him as a purchaser on his own account, and make him account for the price, provided he has in making the purchase, acted with good faith and as a prudent man would have done in his own case.

And if the administrator has, under an order of the Orphan's court, sold a portion of the real estate of the intestate, partly on credit, more advantageously than it could have been sold for cash, and afterwards being pressed for money for the purposes of the estate, he disposes of some of the securities he has taken for the price, at a discount, he is not personally chargeable with the discount, if under all the circumstances, he promoted the interest of the estate by doing so.

Counsel fees, and the expenses of the administrator in prosecuting suits, &c. for which no vouchers were produced, allowed under all the circumstances of the case.

An appeal from the decree of the Orphan's Court of the city and county of *Philadelphia*, on the settlement of the accounts of *Sarah Billington* and *Thomas Billington*, administrators of the estate of *Thomas Billington*, deceased, having been taken to this court, auditors were, on the 15th *April*, 1826, appointed " to report an administration account on the estate of *Thomas Billington* the elder, as well against the original administrators, as against the " administrator *de bonis non*," and on the estate of *Sarah Billington*, deceased, reporting specially the items, with a particular account, with explanations and observations, and to report what allowances should be made out of the distributive part of each child, for their maintenance and education, and payments, and receipts, and to state the balance due to, or by each child, after making the proper deductions: to report what lands *Thomas Billington*, the administrator, purchased on judgments obtained by the administrators, and the present state of the lands; whether disposed of by the said *Thomas Billington* and converted into money ; whether disposed of by *James Tatham*, administrator *de bonis non*, or any other member of the family, and by whom, and in what manner the undisposed of lands are held, and also to report specially all such matters as either party may desire."

(The case of Billington's Appeal.)

The auditors made a very full and elaborate report upon the various matters submitted to them, to which sixteen exceptions were filed on behalf of some of the legal representatives of the intestate, entitled to distributive shares of his estate. The estate being solvent, though embarrassed with debts to a large amount, no exceptions were filed on behalf of creditors.

The nature of the exceptions filed, and the circumstances out of which they grew, will sufficiently appear from the opinion of the *Court*, which, after argument by *Newcomb* and *Tod* for the appellants, and *J. S. Smith* and *J. Sergeant* for the appellees, was delivered by

Huston, J.—*Thomas Billington* the elder, died in October, 1803, leaving a large real estate, personal property of reasonable amount, many debts due to him, and a long and large account of debts due by him; he left a widow and twelve children, two of whom were above twenty-one years of age, and the youngest two or three years of age.

His eldest son *Thomas Billington*, for some time before his father's death had not resided with the family in this city, but was manager for his father at a forge in *Centre* county. This son and the widow administered on the estate. Two inventories were filed, one of the personal property, consisting of household furniture in this city, and another of the stock and tools at the forge. The estate was of amount sufficient to pay all the debts, and to leave a large property for division among the children. In Mr. *Billington's* life the family had lived in a style, not of extravagance, but suited to a respectable and wealthy citizen.

The debts due to the estate could not be collected without suit. These suits were instituted in different counties, where the debtors resided. It is conceded that all proper exertion was used by *Thomas Billington* the administrator, to obtain judgments and executions, but from inability in the debtors to pay, and another cause which will be noticed hereafter, these debts have given rise to a principal question in this case.

In the meantime many of the creditors of the estate were urgent for the amount due them, and within a year after the administration, an order was obtained for the sale of a part of the real estate in this city, and a sale made, and the price paid and received according to contract; for the sale was part in cash, and the residue in instalments; and the creditors became so urgent, that the instalments were turned into cash by allowing a discount; another subject of complaint.

The forge in *Centre* county, and the houses in this city were rented by the administrators, and the children supported by them, or rather by one of them, viz. Mrs. *Billington*. It is true, guardians were appointed, but one of them has been at *Washington* city, or in *Europe* in the service of his country, and the other, who was a lawyer of eminence, is dead. Neither of them ever did any act, as to leasing the property, or attending to the maintenance and education of the

children.   There is little of fault to be charged on them on this ac-count, for the mother of those children was a respectable woman, and their education, &c. is not alleged to have been neglected.

From this it will appear that the administrators, in one way or other, had in their hands the personal estate; the money arising from sale of lands, and that they, or one of them, collected the rents, and maintained and educated the children.

It will be observed that by our laws, the administrators, where letters of administration are granted, give bond and security for the faithful administration of the goods and chattels.

When an order is made on a deficiency of personal assets, to sell lands for payment of debts or maintenance of children, another bond with sureties is given for the faithful application of the money rais-ed by the sale.   The sureties in these several bonds are liable, each, for the due administration of the fund mentioned in the bond, and for no more.

And the guardian, in strictness, ought to lease the lands, and su-perintend, by himself or by contract, the maintenance and education of the minor children, and ought to have settled, in this case, that part of the account, with Mrs. *Billington* as their agent, and then to have settled their own account with each ward, and in the Orphan's court; but in this case the guardians never acted; it does not even appear that they accepted of the appointment; both administrators are dead; we only know of the guardians that they were appointed, and that one of them, and the only one who was here, sanctioned the conduct of Mrs. *Billington*, for he was her counsel to support her conduct and her accounts until his death.

At one time the whole of these accounts of the administration of the goods and chattels; of the proceeds of lands sold by order of the Orphan's court, and of maintenance of children, were blended in one account so that they could not be discriminated.   After a partial hearing on that account, the whole matter was referred to auditors to report an  " Administration account on the estate of *Thomas Bil-* " *lington* the elder, as well against the original administrators, as " against the administrator *de bonis non ;* and on the estate of *Sarah* " *Billington* deceased, reporting especially the items with a particular " account, with explanations and observations, and to report what al- " lowances should be made out of the distributive part of each child, " for their maintenance and education ; and payments and receipts ; " and to state the balance due to, or by each child, after making the " proper deductions ; to report what lands *Thomas Billington* the " younger purchased on judgments obtained by the administrators, " and the present state of those lands ; whether disposed of by the " said *Thomas Billington* and converted into money ; whether dis- " posed of by the said *James Tatham,* administrator *de bonis non,* or " by any other member of the family, and by whom, and in what " manner the undisposed lands are held ; and also to report especially " all such matters as either party may desire."   This very general,

and also very special reference was not solely the act of the court, but was modified to meet the wishes of the parties litigant, who were the children, or some of them, and particularly Mr. *Tatham,* who married the eldest daughter, and who became administrator *de bonis non* of *Thomas Billington* the elder, and administrator of Mrs. *Billington* he administratrix; and with him was also Dr. *Morris,* who married the second daughter. It is said some of the other children also complain. *George,* the eldest son since the death of *Thomas Billington* junr. does not object to the account.

The auditors have reported a most elaborate and lucid statement on all the subjects referred to them.

The children have filed many exceptions; the bail in the administration bond have not filed any, but in argument have endeavoured to shew some mistakes in the arrangement of the items in the several accounts; *i. e.* that some debts set down as paid by proceeds of sales of land, were actually paid by proceeds of personal property; and, secondly, they have insisted that the sum allowed *Thomas Billington* junr. for fees paid to counsel must be greatly too low.

The first and second exceptions are to the manner in which the auditors, in the Orphans court and here, have given credit for the inventories, here and in *Centre* county.

Mrs. *Billington,* finding her husband had died indebted more than she expected, disposed of the plate, and kept all the rest of the personal property. Eleven of the children were then living with her.

As to the stock and tools at the forge, *Thomas Billington* junr. leased it most advantageously, and with it the stock and tools; such parts as were not within that description, he sold to the tenant at a price affixed by two iron-masters, and thus made more of them than probably could have been in any other way; and though the stock and tools are not charged to the administrators in the account of the personal property, they are in the rent account.

In England, the personal property is all liable for debts in case of intestacy, and must all be applied to the payment of debts before the land can be touched; and except for certain debts, land is not at all liable.

In this state, personal property, in case of intestacy, is also all liable for debts; but so also is land for every species of debts.

In the case of an insolvent estate, debts must be paid in a certain order, or the administrator may become personally liable, by paying debts of a lower grade, without leaving a fund to pay those of a higher; but if the estate is solvent, it is no *devastavit* to pay a simple contract debt in point of time, before a bond or judgment.

So again if an estate is insolvent, it is a *devastavit* if the administrator gives any of the personal estate to support the widow or children, (after he knows the estate to be insolvent at least,) but if, considering the real and personal estate, assets as they really are for payment of debts, he is certain there will be a large surplus after payment of debts to be distributed among the widow and children, it is

not misconduct to supply the present and urgent wants of the widow and children out of the only present fund, *to wit,* the personal property. Perhaps, indeed, a creditor might get a judgment against him for a *devastavit,* in strict law in such a case, but then he would stand in the place of that creditor for such sum, or he would have a claim personally against the widow and children, for the sum he had advanced to them, and could retain it out of their distributive shares.

It is, however, right in all cases that the administrators should keep their accounts so separated, as that the account settled will shew the application of the proceeds of personal estate, and the proceeds of land sold by the Orphans court. And where there has been a wasting in fact or in law, of either of these funds, and their sureties are resorted to, it is necessary that they be separated, especially where creditors are the complainants. And where guardians have been appointed and have acted, the court will generally compel them to settle a rent account, and not take it in the first instance into the administrators' account.

In this case the debts are all paid, and the overplus, whether it arose from real or personal estate, is to be divided among the children; and if the administrators, or either of them, is in advance for the estate, that advance is to be taken out of the estate, whether real or personal, before distribution of the clear surplus among the children. It seems to me in this case to result exactly in the same way to the present objectors, whether they were supported by one hundred dollars taken from the personal fund, and that replaced by one hundred taken from the rents, or whether each one hundred dollars was applied strictly according to law. Taking the household furniture and beds, carpets, and kitchen furniture was one way of keeping the family together; selling all those articles and purchasing others on credit, to be paid for as rents came in, was another way of keeping the family together; and no one has said, or will say, the mother ought to have broken up housekeeping, and delivered her children to their guardians, to be put out to board with strangers.

It has not been, and it cannot be contended, that if this furniture, proper for that family in their circumstances, had been sold, any gain would have accrued from selling it and buying other furniture. To be sure, the two eldest daughters complained sometime after their marriage, not that it was improperly taken and used for the family while they were at home, but that it was kept for the use and benefit of the younger children, to their injury; but how are the facts? The auditors in the Orphans' court report, that this property was all kept by the widow, and after being used in support of the children, distributed among them in her life-time, or left to be distributed by her administrators; and the testimony of *George Billington* goes to prove that Mrs. *Tatham* and Mrs. *Morris,* the two eldest daughters, got at least an equal share in her life-time. This report and testimony have not been impugned. There is then no hardship in this respect. *George,* the next eldest, makes no objection, but more, in his deposition, he

(The case of Billington's Appeal.)

says, by the consent of all the family, the income of the estate was permitted to go into their mother's hands to support the family, nor was any objection or any claim ever made, to his knowledge, by any of the children for any part of it, (except by Mrs. *Tatham*, as before stated, in 1815,) who did not persist in it; that his mother had no other means of supporting the family but from his father's estate. Mr. *George Billington* seems to have reflected, that as he and the elder children had, during their infancy, been supported out of their father's estate, though in his life-time, there was no very striking injustice in the case, if a little more was after the father's death, expended in maintaining and educating those who were left very young.

To conclude as to these exceptions, in this case or any other under the same circumstances, I cannot see on what principle the bail can be called on, or the administrators if alive. All the money raised from all the estate left by *Thomas Billington* is to be, and is accounted for; it must all be applied to some legal purpose, and if it does not appear to have been so applied, must be answered for. The answer to the children, and we have none others before us, is, it has been applied to the payment of debts, or to the support and education of the complainants. I appoint a man to collect money due me from two or more perons, and direct him to apply the money collected from one person to a particular purpose, and that collected from other persons, to another purpose; he collects my money, and applies it all as directed, but as he collected it, he threw it into one drawer, and did not keep it separate as ordered. 1 cannot recover damages from him for this, unless I have sustained damage.

The third exception here is, that as certain debts due by *Thomas Billington* at his death were not paid instantly, interest became due to the creditors on those debts, which interest, it is alleged, ought to be paid by the administrators' out of their own pocket. To give any colour to this objection, it ought to have been shown, there were funds in the hands of the administrators to pay those debts. The debts due to *Thomas Billington* also bore interest, and when collected by the administrators, they are charged with the whole sum received including interest. There is no evidence that any money was retained by them in their hands an unreasonable time. In receiving and paying $60,000, perhaps there was no one time, when 1000 lay in their hands for even a few months. If the per cent. allowed the administrators is allowed at the end of each year, and the necessary expenses of suits, &c. I am not sure, the interest account, if made out, would not be the other way. We do not intimate that administrators retaining money are not to pay interest; we only say that on the face of this large and intricate account, there is no ground for a charge of interest against the administrators.

The 4th, 5th and 6th exceptions I shall take together, that judgments were obtained against *William P. Brady, John Brady,* and *John Cummings,* and the administrators are not charged with the

(The case of Billington's Appeal.)

amount of those several judgments, but only with the sums actually recovered.    It is not suggested, that the administrators were at all at any time negligent in pursuit of these claims, or ceased to levy and sell as long as the defendants had any property.  If part of the debt was never collected, it is the loss of the estate, not of the administrator, who has been diligent, but they are charged with all the money ever received, and *Thomas Billington*, junr. the administrator, seeing the property and *the only property* of the defendants, selling on his executions at a price far below what he believed was its value, bid for it. Some of it was struck off to him, and deeds made to him by the sheriff. And the 10th and 12th exceptions are that the administrators are not charged with the price, at which these lands were sold, and the interest.  The referees have considered that these lands were bought, not for the administrator, but for the estate, and belong to the estate.

This presents a question of some importance.   There are cases which require from an administrator what in this country is unreasonable.   Generally I agree that a trustee who changes the fund or the security does so at his peril, but I deny that this is universally the case ; an administrator who releases a debt is generally liable for that debt, but not universally.  A leasehold of 60 years was directed to be sold by the executor ; the tenant in possession had a lease for thirty years of the time, was in arrear for one year rent, and insolvent.  The executor released the year's rent due and gave him £20 for his lease ; he believed this to be the best thing he could do for the estate, and so thought the Chancellor, and it was allowed him. " He did nothing but what was prudent." 3 *P. Wms.* 381.

An executor after consultation with the widow and such of the children as were of age, and taking legal advice, gave up for $750 a leasehold, worth double that sum ; he believed it was forfeited.   He was sued for a *devastavit*, and held not liable for this act.   2 *Johns. Cases*, 376 ; though he was mistaken as to the title and the lease was not forfeited.

In *Hopkins' Reports, A.* died possessed of the notes of a manufacturing company, whose affairs were in great disorder, whose works were stopped, and who were supposed unable to pay their debts.  A new company composed of some of the old partners, and some who had not been partners, undertook to carry on the business, and pay the debts of the old company.   The administrator of *A.* believing it best for the estate, gave up the notes of the old company, and took those of the new company, as did every other creditor of the old company.   The new company immediately after failed, and the debt was lost.   The Chancellor held the administrator not liable, for he acted honestly from the best information he could get, did what every prudent man acting for himself did, and ought not to be held answerable in such a case.   If the first security had been unquestionably good, the law might have been, and I suppose would have been held otherwise.

(The case of Billington's Appeal.)

Conformably to the spirit of these cases, this court had made several decisions. *Bonsall's Appeal*, 1 *Rawle*, 270, is founded on these cases, and as understood and expressed in the report, does not go beyond them. I know the Judge who dissented, chose to consider that case as deciding, that any guardian having money of his ward, might purchase land with it. The judges who decided the cause, did not so decide, nor do the words used import any such thing. There was no money paid; lands in which this ward had an interest were selling at what those heirs who were of age, and the administrators, one of whom was the uncle of the ward, supposed, was greatly below their value. At the instance of this uncle and those heirs, who were of age, the guardian agreed to join in the purchase, or more properly agreed to bid in the land for his ward along with others, rather than suffer it to go from her for much less than it was worth. The purity of motive in the guardian was not questioned by any but the judge, who dissented. He was, under the circumstances proved and admitted in that case, held to be a trustee as to that land for his ward.

I proceed now to the circumstances attending these purchases of *Thomas Billington*, the administrator. The judgments in every case were against men deeply indebted, and when the lands which this administrator bought were gone, there was nothing, on which to levy the residue of the debt. In this state of affairs, he writes to his mother with whom, or near to whom, lived the children who were then of age. That mother was the acting guardian of the minors. The gentleman who had been appointed their guardian, was the lawyer, the legal adviser of the administrators; though we have no evidence directly to prove that Mrs. *Billington* communicated this information of intention to those children, who were of age, or to the guardian. *Thomas Billington*, as he expected was obliged to bid for the lands, or suffer them to be sold to others greatly below their value as he thought, and as there were no other funds on which to levy the debt, that debt so far as it was not covered by the sale, was lost; some lands of each of the three debtors named, were struck down at his bid, and the sheriff's deeds made to him. Of this he immediately informed his mother. No objection to this is made by any person at that time. Some years after, he is called on to settle his account, and understanding that some difficulty as to these purchases was made by some of the family, he sends them in writing a statement how he bought, and an offer, if the family agreed, to take those lands as his own property, and account to the estate for the price bid. This is not agreed to, nor rejected, so far as we know. Soon after *Thomas Billington*, junr. and his mother file an administration account, in which they are not charged with the price of the lands so bought; this was 1815. The next year, *George Billington* goes to see *Thomas* on the affairs of the estate. I assume it, and I have a right to do so, that he went at the instance, and as the representative of the family, most of whom were then of age; and then and only once then, *Thomas* who had become at times intemperate, in a moment of intoxication,

and of irritation at what he thought harsh treatment from the family, said, the family had treated him so badly, he would keep what he had bought. This, says *George*, was the only time he ever evinced any disposition to do wrong. Again the same witness says, I always understood that he had purchased in the property, because it would not sell, and that he could not sell it; and again, that which he bought he did not buy for himself; he bought for the estate to prevent sacrifice, I believe.

On the whole then it appears, that the administrators, or one of them, in the course of collecting some desperate debts, were obliged to bid for some of the lands of their debtors when it was selling; that where they thought any thing like a fair price was bid by any other person, that other person got the land; where the price bid was greatly under the value of the property, and nothing of the defendant's left from which to collect the residue of the debt, it was bid in for the estate. It appears that where any of this land has been since sold, it has been at an advance. It appears that at the time, and after these purchases, the other heirs knew of what had been done; that although some of them at one time called for the price bid, yet when a written proposition was submitted, no answer was given, and thus *Thomas Billington* was kept from improving or using the lands as his own.

It appears that *George Billington*, who stands before us as a man of candor, and sense, and truth, was sent up as to this, and other business, (I say sent, for *Tatham* charges his expenses, and none of the children object to such charge,) that he at all times considered *Thomas* as the purchaser of those lands for the family, and not himself, and such must have been the views of those who employed *George*, or it could not have struck him as wrong for *Thomas* to say the family had treated him so badly, he would keep the lands. At that time the family considered those lands as the general property, and *Thomas Billington* their trustee; he did not use or sell them; he died, and whatever might have been the case at one time, it is too late for the heirs to say, he purchased for himself, and at his own risk, and we will not take the lands. It would be dishonest to claim the lands as belonging to the estate in 1816; to call it a fraud in *Thomas* at that time to hint that he had the power to keep them himself as his own, to prevent his selling them, to insist he was a trustee, and after his death, to assert the contrary in every respect, and call on his infant child to do what they would not permit its father to do. The report is in this respect affirmed.

It is singular Mr. *Tatham*, who became the administrator *de bonis non*, has done the very thing which here he objects to, and to five times the amount of *Thomas Billington*'s purchases. To be sure he got the assent of some of the heirs in writing, but not of all the heirs. I do not mention this as any ground of our decision, but as a matter on which the appellants may reflect. We decide on the ground, that it was prudent, perhaps necessary, in order to collect those debts, to bid

something, and to buy in property going too unreasonably below its value; that when some doubts as to this matter existed, and *Thomas Billington* offered distinctly to keep them himself, or hold them in trust, there was no answer; that two or three years after, when all, or all but one, were of age, the whole family considered him a trustee for them, so much so that it was a crime in him to dispute it for a moment, and his conduct being once ratified by the other heirs, they are bound. Perhaps under the peculiar circumstances of this case, they would have been compelled to accept him as a trustee against their consent. We agree entirely with the general position, that an executor, administrator, or guardian, cannot change the property from real to personal, or the contrary, or accept the security of one person, and give up that of another, or release a debt, without receiving the amount, unless at his own risk. This is the law in all ordinary cases, and where the interest of the estate, or of the ward, was safe by adhering to this rule. But cases may occur, and do often occur, where a debt will be totally lost to the estate by an executor, who adheres to this rule as the only safe one, and yet the debt or the greatest part of it could be secured by accepting an assignment of securities on other persons, or by executing a release in full where part only is paid. Now, as the general rule was introduced for the benefit of the *cestuy que trusts*, it would seem strange if it could not be dispensed with, when their interest requires that a different principle should be adopted. The executor, or administrator, or guardian, must show, that the circumstances required the exercise of a sound discretion; that from all the information and advice he could obtain, the estate would sustain a total or partial loss, unless he exercised a discretionary power, and that what he did was what he really thought best, in the case as presented, what he or any prudent man would do in his own case; that his motives were pure, and his conduct prudent, and if he can do this, it is not easy to see on what principle he can be charged personally.

These observations apply to, and answer the 9th exception, which is, that the administrators have tried to sell the brewhouse for cash, and not succeeding, they sold it on credit as to part of the price, and afterwards being pressed for money, sold the two last bonds of $1222, 23 each at a discount so as to occasion the product to the estate to be about $120 less than if the bonds had been retained until due. The guardians, I have said, were the counsel of the administrators, and we may take it, advised this as preferable to selling more property at that time, or suffering creditors to sell on execution. We do not under the circumstances of this case, see that the report is wrong in this particular.

There are two or three objections to the arrangement of the items of debit and credit, in the account; that is, the appellants insist, that all the deficit should be thrown on that part of the account, which is composed of the personal estate; in other words should fall on the bail of the administrators in the administration bond. This case as we

have considered it, makes these objections immaterial. They are also immaterial as no default is found in the administrator, but I will observe, that in 1815 all the heirs were of age, except two; that, by the consent of all the family, says *George Billington,* the whole of the rents were permitted to go into the hands of Mrs. *Billington,* and all received from her their support and education; that the guardians acquiesced in this, and were never called to account, nor was Mrs. *Billington,* during her lifetime, as to this particular. Now to permit this large account of rents and maintenance, with which the bail in the administration bond had nothing to do, and for the management of which they were never answerable, to be either totally overlooked, or so arranged as to find no default in it, and throw every alleged default on the other parts of the account, in order to fix the bail, would be inconsistent with my notions of the exercise of equitable power, and different from the exercise of it in other tribunals. There is nothing in the arrangement of the items in the different accounts, of which the appellants can complain, or if there is, there are items to a greater amount which might be transposed in favour of the bail.

The amount allowed *Thomas Billington,* junr. for expenses, and counsel fees, is objected to by the appellees as too small, and by the appellants as too large. An administrator ought always to take vouchers for money paid, and to keep an exact account of time spent in the business of the estate. *Thomas Billington* filed an account in 1815, expressly stated not to be final. In this no charge was made for expenses, counsel fees, or per centage for receiving and paying money; soon after he died. The person who administered on his estate, says, he delivered all the papers, &c. to the administrator *de bonis non;* that is, to the appellants. I do not mean to insinuate that any thing has been suppressed by them, but there may be many letters, memorandums, &c. from which with a little explanation, vouchers might be obtained, and there may be circumstances from which the payment of money may be certainly inferred. I was examined, and stated from my memory, having no notice to examine vouchers, that I had received $150 as counsel fees in two cases. The discussion here has brought to my recollection another case in which I was concerned, and for which I was paid. Judge Duncan had been counsel in several cases, and he says, the counsel were paid for their services, but mentions no sum; he proves that Mr. *Watts,* and others were employed, and I take it, were paid. or demand would have been made of the administrator *de bonis non.* We have then evidence of nine suits brought and ended under the management of *Thomas Billington,* junr. several of them of large amount, and warmly contested; one tried three times, and yet an allowance of only $300 for counsel fees, and $2.80 the whole amount allowed for attention, expenses, and payment of taxes from 1803 till 1814.

The administrator *de bonis non* collected $2,400, from two debtors, and paid taxes four or five years; sold and purchased in for

the estate, *Rees*'s lands on a judgment obtained by *Thomas Billington*, and charges about $2,200, more than half of which is for coun-. sel fees; yet he was the principal appellant as to the allowance to *Thomas Billington*. I feel compelled to say, there is in this cause evidence, which would have justified the allowance of a larger sum on the item of counsel fees to *Thomas Billington*, junr.; we therefore allow an addition to this item of seven hundred dollars. I am aware of the danger of the precedent of allowing to an administrator, credits for which no vouchers are produced. In this case *Thomas Billington*, junr. is dead; his widow is dead; his brother-in-law Mr. *F. B.* who administered, is dead; *C. Hall*, Esq. who was guardian of his infant child, is dead; the counsel who were concerned for *Thomas Billington*, junr. as administrators, are, except myself, dead. And every paper and memorandum from which an account could be made, have been long in the possession of one of the complainants. Under these circumstances we have in this case made the allowance.