NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0094n.06

No. 22-1968

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **FILED** |
| Plaintiff-Appellee, | ) | Mar 04, 2024 |
|  | ) | KELLY L. STEPHENS, Clerk |
| v. | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN |
| JOHNNY HO, | ) |  |
| Defendant-Appellant. | ) | OPINION |
|  | ) |  |

Before: SUTTON, Chief Judge; WHITE and BUSH, Circuit Judges.

JOHN K. BUSH, Circuit Judge. A jury convicted Johnny Ho of wire-fraud conspiracy, wire fraud, and money laundering. During jury selection, rather than requiring each member to verbally answer each inquiry, the magistrate judge posed questions to the venire as a group and asked them to raise their hands if they had a response. At trial, the district court excluded testimony by Ho's private investigator as inadmissible hearsay. Ho argues that the magistrate judge's voir dire and district court's evidentiary ruling violated his Sixth Amendment right to a fair trial. Because the magistrate judge did not abuse her discretion and any evidentiary error by the district court was harmless, we AFFIRM Ho's conviction.

**I.**

**A. Government-Issued Loans During the COVID-19 Pandemic**

In the early days of the COVID-19 pandemic, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (CARES Act), Pub. L. No. 116-136, 134 Stat. 281 (2020).

Section 1102 of the Act added a new product, the "Paycheck Protection Program" (PPP), to the loan program of the U.S. Small Business Administration (SBA). PPP loans, funded by the SBA but administered by banks, were available until May 2021 to businesses with no more than 500 employees. Businesses that hired only independent contractors were not eligible to receive a PPP loan. The program required applicants to submit information about their business income and expenses, including payroll, with supporting documentation. These supporting documents could either be payroll records or IRS Forms 940 or 941, which respectively document annual and quarterly payroll expenses. The SBA mandated that PPP funds be used to retain workers and maintain payroll, and to make mortgage, lease, and utility payments. Borrowers had to certify that they understood the program rules, and those that followed the rules were eligible for loan forgiveness.

The SBA also administers the Economic Injury Disaster Loan (EIDL) program, which provides 30-year, low-interest loans up to $2 million to small businesses that experience substantial economic injury from a disaster and are unable to obtain credit elsewhere. 15 U.S.C. § 636(b)(2). Only businesses with 500 or fewer employees qualify for the loan, and applicants must have a credit score of at least 570. EIDL proceeds must be used for normal expenses, such as fixed debts, payroll, and utilities, that cannot be paid due to the disaster's economic impact. The CARES Act authorized the SBA Administrator to waive the requirements that EIDL borrowers be unable to obtain credit elsewhere and provide a personal guarantee on loans less than $200,000. CARES Act § 1110(c). The SBA permitted businesses to collect both PPP and EIDL loans but mandated that they could not use the proceeds for the same purposes.

**B. Ho's Loan Applications**

Johnny Ho owned Diva Nails & Spa in Northville, Michigan. In April 2020, after the salon closed because of the pandemic, Ho made two PPP loan applications on behalf of Diva Nails to JPMorgan Chase. The first, submitted April 11, asserted that the business had eight employees and monthly payroll expenses of $20,000. The second, submitted April 23, listed ten employees and monthly payroll expenses of $50,000. Both were denied because they did not include supporting documents. Ho then met with his next-door neighbor, Antonio George, who owned several businesses, including a logistics and transportation business called ATX. George had successfully obtained a PPP loan for ATX, so Ho asked for his assistance with the Diva Nails application. George agreed, and instructed Ho to open an account for Diva Nails at Citizens Bank.

That is where George's and Ho's stories diverge. By George's account, in exchange for 10% of the loan proceeds, he agreed to falsify Diva Nails's application by including IRS forms completed with ATX's payroll expenses. George testified that they planned for Ho to disburse the loan proceeds to George as payroll to feign compliance with the program requirements and secure loan forgiveness. George would keep 10% then wire the remainder back. **[**

Ho, on the other hand, testified that he provided George with Diva Nails's 2019 tax returns and Citizens Bank information, requesting that George "do [the PPP loan application] right." R. 60, PageID 1071. According to Ho, George independently prepared the tax forms and submitted the loan application without Ho's knowledge of its false contents. Ho did not deny that he opened an account with Paychex, a payroll service, and distributed payroll to several companies owned by or associated with George. But he maintained that he paid George for real work, such as removing ventilation systems and shipping packages. And he did so through payroll because that is what George requested.

Regardless, Ho certified that the information in the Diva Nails PPP loan application and its supporting documents was truthful. Consistent with George's testimony, the application included tax forms identical to those submitted by ATX: both companies reported that they had 42 employees and quarterly payroll expenses of $153,302.50. And, in contrast to the first two Diva Nails applications, the third reported average monthly payroll expenses of $90,414Citizens Bank received the application on May 12, 2020, and disbursed $193,700 to the Diva Nails account six days later. Ho distributed $16,500 to eleven entities associated with George via Paychex on June 8. But Citizens Bank froze Diva Nails's PPP funds soon after, and no more disbursements were made.

With the PPP funds frozen, Ho again approached George for help. George explained to Ho that, of all his companies, only SFX Transportation, Inc. had not filed an EIDL loan application. They agreed that Ho would file the EIDL application for SFX and, in return, George and his business partner (the majority owner of SFX) would get 10% of the funds. Ho opened an account under SFX's name at JPMorgan Chase, listing himself as signatory. George provided Ho with the information necessary to complete the application. Because Ho did not have the requisite credit score for an EIDL loan, he enlisted his brother-in-law, Luan Pham, to cosign the application and falsely reported that Pham owned SFX.

The EIDL application was approved and $149,900 was deposited to the SFX account on August 4, 2020. That same day, Ho disbursed the funds to four of George's businesses through cashier's checks. George returned a portion of that money to accounts controlled by Ho. At trial, Ho admitted that he was not affiliated with SFX but, nevertheless, the company's EIDL application contained his information , and he opened the Chase account, wrote the checks to George, and

received money back from George. Ho explained that he thought this was "just a loan [he] would have to pay back."

**C. Ho's Criminal Proceedings**

Ho was indicted in January 2022 on one count of conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349; two counts of wire fraud, in violation of 18 U.S.C. § 1343; and two counts of money laundering, in violation of 18 U.S.C. § 1957. George was also indicted and pleaded guilty to wire-fraud conspiracy and aiding and assisting the filing of false tax returns in 2021. George's wire-fraud-conspiracy charge related to the submission of 29 fraudulent PPP and EIDL loan applications totaling over $4 million. His tax-fraud charge related to returns George prepared on behalf of several clients to inflate their reported business expenses and reduce their tax liability. At Ho's trial, he was one of the government's key witnesses.

### 1. Voir Dire

With Ho's consent, a magistrate judge conducted voir dire. Following a detailed survey in which the venire members provided demographic information, the magistrate judge instructed that she would ask them questions collectively. If they had a response to one of her questions, they were to raise their hands. The magistrate judge then asked a series of questions and, when a prospective juror had a response, he or she raised a hand and the magistrate judge asked follow-up questions. After a series of questions elicited no responses from the venire, Ho's counsel requested that each prospective juror be required to verbally respond with a "yes" or "no." The magistrate judge declined, determining that, based on the venire members' responses thus far, they understood their obligation to raise a hand if they had a response to her questions.

**2. Evidentiary Rulings**

Ho's primary defense strategy at trial was to portray George as a liar who, unbeknownst to Ho, included false information on the PPP loan application. The weekend before trial was set to begin, Ho filed a proposed witness list including the tax clients whom George aided and assisted in filing falsified returns, as well as the IRS special agents who worked the case. The government then filed a motion in limine to preclude Ho from calling those witnesses, arguing that such evidence was extrinsic and beyond the scope of permissible impeachment allowed by Federal Rule of Evidence 609. Ho responded that the tax clients and IRS agents would "show that George submitted fraudulent expenses on [] the tax payers [sic] returns, unbeknownst to the tax payers," which "shows a pattern of George acting on his own to make more money available for himself, and the people that he is working for, without these other people knowing about it." R.26, PageID 90.

The parties discussed the motion in limine with the district court before trial began. The government explained that the tax clients' and IRS agents' testimonies would be improper extrinsic evidence because the only extrinsic evidence that can be used to impeach a witness's credibility is his criminal conviction. Moreover, any testimony by those witnesses about George's statements would be inadmissible hearsay. If Ho wanted to ask George about the tax clients' statements or other extrinsic evidence, he could do so on cross-examination—as the government intended to ask him about the tax-fraud conviction—but he could not submit that evidence to the jury.

The district court concluded that extrinsic evidence of a witness's prior acts of untruthfulness was admissible "if it goes to the impeachment of the witness, to his reputation for truthfulness." R.56, PageID 478. It ruled that the tax clients could testify that they were not aware that George had falsified their returns because that "[went] to part of the conviction for which Mr.

George has already pled guilty" and "to his reputation for . . . truthfulness."[1] *Id.* at 479. The court ruled that the IRS agents, however, could not testify about the statements the tax clients made because that would be hearsay.

When Ho called the tax clients to the stand, each asserted his or her Fifth Amendment right against self-incrimination and became unavailable under Federal Rule of Evidence 804(a)(1). Before that. Ho had requested that he instead be allowed to call his private investigator, Desiree Edwards, to testify as to the statements the tax clients made to her. Or, alternatively, he requested that he be allowed to call the IRS agents who interviewed the tax clients (and whom the court had earlier determined could not testify). As a third option, Ho asked to submit as evidence the memoranda prepared by the IRS agents summarizing their interviews with the tax clients.

The district court ruled that Edwards could not testify but admitted the IRS memoranda. The court explained that Edwards's testimony would lack the indicia of reliability and truthfulness required by Rule 804 because it was "one step further removed from the actual statement[s] of the witness[es]" than the IRS memoranda, which "are the actual statements of the witness rather than the investigator's interpretation in a subsequent questioning." R.60, PageID 1034. The court added that Edwards's testimony was less reliable than the memoranda because she faced no liability for the tax clients' actions. In contrast, because the tax clients faced potential liability for their statements to the IRS agents, the court determined the IRS memoranda were admissible hearsay as statements against interest.

---

[1] There is an error in the court transcript. It presents this statement as being made by Ho's counsel, Mr. Foster, rather than the court. The statement was clearly made by the court because it contains an evidentiary ruling: "So with respect to the taxpayers, I'm going to let them testify. With respect to the IRS agents, I agree with you, that's hearsay and they can't testify." R. 56, PageID 479.

The IRS memoranda contain summaries by the investigators of what the tax clients told them, with few direct quotes from the tax clients.[2] When asked by Ho's counsel why the memoranda were admissible but not the investigator's testimony, the court stated that "there is a rule against extraneous evidence on matters that are not central to the case," and the reliability of witnesses "generally may not be proved by . . . extraneous evidence." *Id.*, PageID 1035. The court did not explain why the tax clients' testimony and the memoranda, but not the investigator's testimony, passed this test.

## II.

### A. Voir Dire Process by the Magistrate Judge

On appeal, Ho first contends that the magistrate judge's voir dire process violated his Sixth Amendment right to a fair trial by an impartial jury because she did not require each prospective juror to verbally answer "yes" or "no" to each question posed to the group, preventing Ho from effectively exercising his peremptory challenges. The district court, including a magistrate judge acting by the court's authority, has a great deal of discretion in impaneling an impartial jury, and we will not disturb exercises of that discretion absent a clear showing that it has been abused. *See* Fed. R. Crim. P. 24; *United States v. Tsarnaev*, 595 U.S. 302, 313 (2022); *United States v. Martinez*, 981 F.2d 867, 870 (6th Cir. 1992).

---

[2] To illustrate, paragraph 12 of the first memorandum reads, "[The tax client] initially stated George returns the returns line-by-line and stated nothing seemed out of the ordinary. [The tax client] later corrected himself, stating George did not review the Schedule C business returns with him." App. R.34, pp. 4. In Ho's proffer describing what his private investigator would testify to regarding her conversation with the same tax client, he wrote: "[The tax client] said he didn't realize the information listed on his Schedule C document was fraudulent until the federal agents informed him during the Zoom interview. [The tax client] said he went back to review the documents himself and saw George had listed a business owned by him and his wife that didn't exist. He said he never would've noticed it if the agents hadn't brought it to his attention." R.31, PageID 158–59.

The Sixth Amendment guarantees an accused the right to be tried by an impartial jury. U.S. Const. amend. VI. Voir dire supports this guarantee by eliciting responses from prospective jurors that allow the court to disqualify potentially biased jurors and allow the parties to effectively exercise their peremptory challenges. *See Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981). Peremptory challenges are guaranteed by statute, not the Constitution. Fed. R. Crim. P. 24(b); *United States v. Martinez-Salazar*, 528 U.S. 304, 311–12 (2000). Nevertheless, a judge cannot conduct voir dire "in a manner that unduly impairs the defendant's ability to exercise his peremptory challenges." *Martinez*, 981 F.2d at 870. Put differently, the court's questions should uncover the prospective jurors' relevant biases. *See id.* at 870–71; *United States v. Guzman*, 450 F.3d 627, 632 (6th Cir. 2006).

That said, the court retains broad discretion on what questions it will ask and how it will ask them. It must pose questions submitted by counsel only if it deems them appropriate, Fed. R. Crim. P. 24(a), and can choose to voir dire the prospective jurors as a group or individually. *Guzman*, 450 F.3d at 632–33 (explaining that "conducting the process before the entire panel can actually lead to more open and thorough voir dire" because witnessing other potential jurors' answers may cause venire members "to be more candid," *id.* at 633). It is also up to the court whether it, and not the parties, will examine the prospective jurors. Fed. R. Crim. P. 24(a); *see United States v. Farris*, 733 F. App'x 237, 241 (6th Cir. 2018).

Ho contends that it was impossible to effectively exercise his peremptory challenges because the majority of the venire did not provide answers to the magistrate judge's questions. His challenge rests on the premise that the prospective jurors' silence in response to the magistrate judge's questions constituted non-answers. But impaneled jurors are presumed to be impartial, and they are presumed to follow the trial court's jury instructions. *Guzman*, 450 F.3d at 629. Here,

after the venire was sworn in and each member provided demographic information, the magistrate

judge instructed:

> [T]here's a whole series of other questions that I'm going to ask to you collectively. If you have a comment or want to add something or want to respond to this -- any of these questions, I ask that you raise your hand and we'll pass the microphone to you. Okay?

R. 55, PageID 432.

It is clear that the prospective jurors understood their obligation to raise a hand if they had

something to say in response to the judge's questions. Indeed, in response to the court's second

question—whether the jurors had any involvement with PPP loans—two jurors raised their hands

to indicate a response. The magistrate judge asked follow-up questions to elicit details on their

involvement and dismissed one juror based on his answers. Over the course of voir dire, many of

the jurors raised their hands to respond to questions, some several times, and the magistrate judge

asked clarifying questions.[3]

Importantly, neither party objected to the magistrate judge's proposed method after she

explained how she planned to conduct the voir dire. Indeed, Ho did not object to the magistrate

judge's method until a string of eight questions went without any juror raising a hand to indicate

---

[3] R. 55, PageID 441–43 (five jurors responding that they had experience in a lawsuit as a juror, plaintiff, defendant or a witness); *id.*, PageID 444–47 (six jurors responding that they or a family member had a connection with a government agency); *id.*, PageID 447–50 (two jurors responding that they, a family member, or close friend had been the victim of a crime or a witness in a criminal case); *id.*, PageID 448–49 (two jurors responding that they had health problems which would cause a difficultly in sitting as a juror); *id.*, PageID 453–54 (one juror agreeing that the burden is on the government to prove a defendant's guilt or innocence beyond a reasonable doubt); *id.*, PageID 458–60 (four jurors responding that they, a family member or a close friend had worked for a bank, lender, loan processor, or other financial institution); *id.*, PageID 460–62 (seven jurors responding that they, a family member or a close friend owned a small business); *id.*, PageID 463–64 (three jurors responding that they been a victim of or otherwise affected by what they believed to be fraud).

a response. His counsel asked that each juror be made to answer the court's questions with a verbal "yes" or "no," because "given the opportunity not to speak," the jurors could "avoid answering the question." *Id.*, PageID 451–52. The court overruled the objection and noted that "all of [the jurors did] not hesitate to raise their hand to any question that [the court] had posed," which suggested that they had listened to her instructions and were abiding by their oath.[4] *Id.*, PageID 452.

Ho claims that the magistrate judge's process deprived him of the information necessary to exercise his peremptory challenges. Yet he fails to specify what that necessary information was. The magistrate judge adequately covered the topics that were likely to come up in trial: she asked whether any of the jurors knew Ho or key witnesses, whether they were familiar with the PPP and EIDL programs, whether they had suffered financial fraud, whether they could judge a law-enforcement agent's credibility the same as any other witness's, and so on. Beyond a bare assertion that the jurors' silence constituted non-answers, Ho offers nothing to dispel the presumption—or disprove the evidence—that the venire understood the magistrate judge's instruction to raise a hand if they had an affirmative response to her questions. Finally, Ho does not even allege that after the exercise of his supposedly ill-informed peremptory challenges, he learned that any empaneled juror was impartial or caused him to suffer an unfair trial.

**B. Evidentiary Ruling by the District Court**

Ho next contends that the district court violated his Sixth Amendment right to a fair trial when it refused to admit the hearsay testimony from his private investigator about tax fraud aided and assisted by George. We review the district court's evidentiary rulings for abuse of discretion.

---

[4] The government suggests that, to the extent Ho challenges the magistrate judge's finding that the jurors answered her questions, we should review that finding for clear error. Because Ho's challenge is to the magistrate judge's overall process, not the specific finding following his objection during voir dire, we review for abuse of discretion. Regardless, Ho's argument fails under that less stringent standard.

*Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 378 (6th Cir. 2009). And if the district court abused its discretion, we will not reverse harmless evidentiary errors. *Cooley v. Carmike Cinemas, Inc.*, 25 F.3d 1325, 1330 (6th Cir. 1994). In other words, if "substantially equivalent evidence of the same facts was admitted," and "the absence of the evidence had no effect on the final result of the trial," then any error is considered harmless. *In re Air Crash Disaster*, 86 F.3d 498, 526 (6th Cir. 1996) (cleaned up). Because any evidentiary error committed by the district court here was harmless, we affirm Ho's conviction.

As explained above, Ho sought to introduce testimony from George's tax clients that, although they swore the contents of their tax returns were true, George had falsified the contents without their knowledge. When the tax clients became unavailable, Ho asked that Edwards, his private investigator, be allowed to testify as to what the tax clients told her under the statement-against-interest hearsay exception. *See* Fed. R. Evid. 804(b)(3)(A). The district court did not allow Ho to call Edwards for that purpose but did admit into evidence memoranda documenting the tax clients' statements to IRS investigators. The court explained that Edwards's testimony was extrinsic evidence and "one step further removed from the actual statement[s] of the witness[es]" than the memoranda. R.60, PageID 1034.

Ho believes that the district court's decision to admit the memoranda, but not Edwards's testimony, was an abuse of discretion for two reasons: first, because he was unable to directly contradict George's testimony that the tax clients had knowledge of the tax-fraud scheme, and second, because the ruling limited his ability to advance the defense that George acted alone in submitting the fraudulent loan applications. Regardless of whether the district court's reasons for distinguishing between Edwards's testimony and the memoranda were incorrect, any evidentiary error made as a result was harmless because, even if the jury had heard Edwards's testimony, it

would not have made a difference given the overwhelming evidence that Ho was complicit in the fraudulent filings.

### 1. Conspiracy to commit wire fraud and wire fraud

Conspiracy to commit wire fraud requires the government to prove that "two or more persons conspired, or agreed, to commit the crime of [wire fraud]" and "that the defendant knowingly and voluntarily joined the conspiracy." *United States v. Rogers*, 769 F.3d 372, 377 (6th Cir. 2014) (quoting Sixth Circuit Pattern Criminal Jury Instruction 3.01A); *see* 18 U.S.C. § 1349. Wire fraud itself consists of three elements: (1) willful participation in a scheme to defraud, (2) the use of interstate wire communication "in furtherance of the scheme," and (3) intent "to deprive a victim of money or property." *See United States v. Faulkenberry*, 614 F.3d 573, 580–81 (6th Cir. 2010); 18 U.S.C. § 1343.

The jury had ample reason to conclude that Ho willfully participated in a scheme to defraud and intended to deprive the government of money. Ho testified that he is an experienced businessman, owned two successful nail salons, and had experience applying for business financing. He also testified that he had successfully applied for car and home loans and knew that it was important to include accurate information on loan applications. Nevertheless, at trial he admitted that he knew the information in the SFX EIDL loan application was false when he signed it, certifying that its contents were true.

Ho did not admit that he falsified Diva Nails's PPP loan applications. But he agreed that, within 31 days, he submitted—and certified as true—three separate PPP loan applications with wildly different employee headcounts and monthly payroll expenses. As noted, the first reported eight employees and monthly payroll of $20,000. The second, submitted twelve days after the first, ten employees and a monthly payroll of $50,000. The best explanation he could give for that

discrepancy was that he hired two additional employees—in the middle of the pandemic, while his business was closed. And minutes later, Ho said that he had no payroll expenses at the time. On the third application, which Ho submitted with George's assistance, the number of employees jumped to 42 and the monthly payroll to $90,414. Ho admitted these numbers were false but disclaimed knowledge of the inaccuracies at the time it was submitted. In the context of the first two applications, and considering the evidence that Ho sent some of the PPP proceeds to George's businesses through Paychex, it is highly unlikely that the excluded evidence—which involved false tax returns not fraudulent loan applications—would have swayed the jury to a not-guilty verdict.

### 2. Money laundering

Money laundering in violation of 18 U.S.C. § 1957 requires the government to prove five elements: that (1) the defendant "engaged in a monetary transaction" in the United States; (2) knowing "that the transaction involved criminally derived property"; (3) "the property was greater than $10,000"; (4) the property derived from specified unlawful activity, which includes wire fraud; and (5) the transaction occurred in the United States. *United States v. Rayborn*, 491 F.3d 513, 517 (6th Cir. 2007); *see* 18 U.S.C. § 1957.

Even if the jury heard Edwards's testimony that the tax clients were unaware that George falsified their returns, it still had plenty of evidence to conclude that Ho laundered money. The government presented proof that Ho intentionally funneled the proceeds of the PPP and EIDL loans to George. For the PPP loan, Ho opened an account at Citizens Bank to receive the proceeds and an account with Paychex to distribute them to George's business as "payroll." He submitted to Paychex the necessary paperwork to pay eleven entities associated with George. Once the PPP proceeds hit the Citizens Bank account, Ho sent $16,500 to Paychex, which was then distributed to the George-associated entities in $1,500 increments.

For the EIDL loan, Ho admitted to opening a bank account for SFX, despite having no affiliation with the company. He also stated that, on the same day he received the proceeds of the EIDL loan, he disbursed the entire amount to four George-associated entities in cashier's checks. Ho explained he did this only because George told him to, but the cashier's checks were labeled as payments for domestic transports, retail space, storage equipment, and lighting supplies. Finally, Ho admitted that George returned a portion of the funds—$15,000 to an account under Ho's name opened just one day prior and $14,650 to Diva Nails's bank account. All told, there was overwhelming evidence that Ho knew the proceeds from the PPP and EIDL loans were the result of unlawful activity and carried out financial transactions with that knowledge.

## III.

For the reasons set forth above, we **AFFIRM** Ho's conviction.